UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| DUNN-McCAMPBELL ROYALTY | § | |
| INTEREST, INC., et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. V-06-59 |
| v. | § | |
| | § | |
| NATIONAL PARK SERVICE, et al., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION & ORDER**

Pending before the Court is Defendants' Second Rule 12(b)(1) Motion to Dismiss (Dkt. No. 16).  Defendants urge two grounds for dismissal: (1) that this Court does not have the authority to vindicate the rights of a third-party beneficiary to a contract between the United States and the State of Texas; and (2) that relevant portions of the March 2001 Oil and Gas Management Plan promulgated by the National Park Service for the Padre Island National Seashore do not constitute a "final agency action" such that the exercise of subject matter jurisdiction is appropriate under the Administrative Procedure Act (APA).  Having reviewed the motion, the response thereto, the entire record, and the applicable law, the Court is of the opinion that Defendants' motion should be denied.

**Background**

Both parties included in the briefs substantially consistent and extensive histories of this dispute along with the title and statutory provenances of the tracts of real property that were combined to form Padre Island National Seashore (PINS or "the Park"), which traverses parts of Kleberg, Kenedy, and Willacy counties along the lower Texas Gulf Coast.  It is, therefore, not necessary for the Court to recite any more of the facts than are necessary to address the pending motion.  Plaintiffs

purport to be the owners of a mineral estate underneath substantial portions, if not all, of PINS. According to Plaintiffs, their predecessors-in-title owned both the surface and mineral estates, but conveyed the surface estate in 1921 subject to a reservation of the mineral estate together with the rights of ingress and egress. The National Park Service (NPS) now owns parts of the surface estate overlying Plaintiffs' mineral estate pursuant to various Texas and federal laws and a Texas deed that conveyed the surface estate from the State of Texas to the United States for the establishment of PINS. In 2001, after a considerable gestation period, the NPS promulgated a document titled "Oil and Gas Management Plan," the stated purpose of which is to "describe[] the overall approaches that will be implemented over the next 15 to 30 years ... to manage existing and anticipated oil and gas operations ... of nonfederal oil and gas underlying Padre Island National Seashore." Dkt. 24-2 at 4 (hereinafter "the Plan"). In general, the Plan presents a comprehensive collection of laws, goals, considerations, and permitting conditions under which the NPS will evaluate proposals by private operators to extract and develop oil and gas resources from the mineral estate beneath the Park.

The second chapter of the Plan includes a section describing what are referred to as Sensitive Resource Areas (SRAs). *Id.* at 9. SRA's are defined in the Plan's glossary as "[l]ocations of particularly rare and/or vulnerable resources identified by the [Environmental Impact Study] team." *Id.* at 176. The Plan identifies numerous SRAs comprising 68,731 acres, or 52.7 percent of the surface area within the Park. *Id.* at 9. The Plan also announces that certain "operating restrictions" will be tailored and applied to each SRA "to avoid or minimize potential adverse impacts from specific types of oil and gas operations, including geophysical exploration[,] ... well drilling, treatment and storage ... operations, and construction and maintenance of roads and pipelines." *Id.* The operating restrictions that the Plan applies, in various combinations, to the SRAs are referred to using the following relatively self-explanatory nomenclature: "No Surface Disturbance, No Surface Occupancy,

2

No Surface Access, and Timing Stipulations." *Id.*  The Plan goes on to present a table listing the SRAs with the operating restrictions applicable to each. *Id.* at 10–11.

The NPS was blunt in describing the cumulative effect of applying the various operating restrictions in certain combinations within the SRAs.  For instance, the Plan notes that "[s]pecific operating restrictions applied to SRAs will effectively close surface use on ... 9,941 acres (7.6% of the park) to drilling operations.[1]  The Plan makes several other references to the chilling effect on oil and gas exploration and development intended by the application of the strictest operating restrictions in some of the SRAs.  In a chapter on impacts to drilling operations, the Plan notes that drilling "operations could take place at any location unless under Current Legal and Policy Requirements or under Sensitive Resource Area Operating Restrictions, that operation is controlled or precluded." *Id.* at 120.  Indeed, it would seem that the Plan's effective closure of 9,941 acres to drilling operations would be such an instance where operations were "precluded."  Thus, it is clear that the implementation of SRA operating restrictions was intended to and, in fact, does foreclose the use of substantial surface acreage within PINS for the production of oil and gas.

Even though the Plan "effectively close[s]" some surface acreage to drilling operations, it is only fair to note that the Plan does not specifically preclude using other methods, such as directional drilling, to access minerals below the surface of restricted SRAs from unrestricted non-SRA areas consistent with other laws and regulations.  The Plan notes, for instance, that "[u]nder the oil and gas management plan, all oil and gas would be accessible," while conceding that "[t]here would be increased costs for operators to design operations to avoid or reduce impacts to SRAs.  In particular,

---

[1]The NPS apparently reached this conclusion by aggregating the total acreage of SRA to which the No Surface Disturbance, No Surface Occupancy, or No Surface Access operating restrictions are applied.  The Plan also notes that operating restrictions effectively close surface use on 1,316 acres to geophysical exploration; 9,202 acres to construction and maintenance of new pipelines; 4,810 acres to construction and maintenance of new roads; and all 68,731 SRA acreage to siting new treatment and storage facilities.

3

directional drilling ... under SRAs may need to be used where No Surface Occupancy or No Surface Disturbance is specified." *Id.* at 121–22.  Plaintiffs would presumably argue, however, that, in at least some areas, this availability of other <u>feasible</u> or <u>possible</u> methods of extraction would be severely cost prohibitive in the competitive industry of oil and gas production.  Plaintiffs all but make this point by claiming that, "[a]s a result of the Park Service's position, oil companies are not interested in entering into leases with Plaintiffs because it is an exercise in futility."  Dkt. No. 24 at 8.  However, the fact that drilling in restricted SRAs might be possible – even if not economically viable – is of no moment to the Court's analysis, since the question presented by Defendants' second ground for dismissal is whether Plaintiffs' case is based on a "final agency action," not whether a theoretical workaround is available to Plaintiffs.

Plaintiffs' live complaint presents a single cause of action under § 706 of the APA. Specifically, Plaintiffs claim that their rights of ingress and egress to the surface above their mineral estates is recognized and provided for by, inter alia, 16 U.S.C. § 459d, the Padre Island National Seashore Enabling Legislation. which authorized the United States to acquire the surface estate from the State of Texas, and that the closure by the NPS of certain SRAs is subject to judicial review because it was, borrowing language from § 706(2)(B)&(C), "arbitrary, capricious, and an abuse of discretion, and otherwise not in accordance with" the Enabling Legislation.  Dkt. No. 11 ¶ 30.

Defendants' urge two grounds for dismissing Plaintiffs' complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  First, Defendants urge the Court to construe Plaintiffs' cause of action under the APA as a veiled attempt to enforce their rights as a third-party beneficiary to the contract conveying the surface estate to the United States.  Because the federal courts are not authorized to order the United States to specifically perform a contract to which it is a signatory, Defendants argue, this Court lacks subject matter jurisdiction.  Second, and in the alternative,

Defendants argue that the application of operating restrictions to the SRAs does not constitute a "final agency action," which is a prerequisite to maintaining a cause of action under § 706 of the APA.

## Standard of Review

Federal Rule of Civil Procedure 12(b)(1) permits dismissal for lack of jurisdiction over the subject matter. When federal courts consider questions of subject matter jurisdiction, the precedent regarding its fundamental importance is clear. "It is a fundamental principle that federal courts are courts of limited jurisdiction." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978). "[A]bsent jurisdiction conferred by statute, [federal courts] lack the power to adjudicate claims." *Veldhoen v. United States Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994). "It is incumbent on all federal courts to dismiss an action whenever it appears that subject matter jurisdiction is lacking. 'This is the first principle of federal jurisdiction.'" *Stockman v. Federal Election Commission*, 138 F.3d 144, 151 (5th Cir. 1998) (quoting Hart & Wechsler, *The Federal Courts and the Federal System* 835 (2d ed. 1973)). Under Fifth Circuit precedent, a case may be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) based on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Robinson v. TCI/US West Communications Inc.*, 117 F.3d 900, 904 (5th Cir. 1997).

## Discussion

### 1. Sovereign Immunity

Defendants argue that Plaintiffs lawsuit seeks relief for which the Government has not waived its sovereign immunity. More specifically, Defendants claim that although Plaintiffs "are asking the Court to enter a judgment declaring that portions of the Oil and Gas Management Plan are invalid," they are essentially seeking to "enforce a third-party beneficiary contract between the United States

and the State." Dkt. No. 16 at 10.  Defendants then cite numerous cases holding that federal district

courts do not have jurisdiction to order the United States to specifically perform a contract.  *See, e.g.*,

*Coggeshall Development Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989) ("Federal courts do not have

the power to order specific performance by the United States of its alleged contractual obligations.")

(citing *Florida Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 679 (U.S. 1982)).  According

to *Coggeshall*, "[t]he only remedy to which the United States has consented in cases of breach of

contract is to *the payment of money* damages in either the Court of Claims, if the amount claimed is

in excess of $10,000, or the district courts, where the amount in controversy is $10,000 or less."

*Coggeshall*, 884 F.2d at 3 (emphasis in original) (citing the Tucker Act, 28 U.S.C. § 1491, and the

Little Tucker Act, 28 U.S.C. § 1346, respectively).

But while it is true that the Tucker Act grants to the United States Court of Federal Claims

exclusive jurisdiction over suits seeking money damages in excess of $10,000 from the United States

based on contract, the Tucker Act is not the only general federal waiver of sovereign immunity for

non-tort civil actions.  The APA also serves as a waiver of sovereign immunity that allows a private

party to sue the Government.  *Stockman v. Federal Election Comm'n*, 138 F.3d 144, 152 (5th Cir.

1998) (citing *Veldhoen v. United States Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994).  It would

seem, then, that Defendants' motion to dismiss based on sovereign immunity should be denied if this

Court satisfies itself that Plaintiffs' APA claim does not actually assert a contract claim that should

have been brought under the Tucker Act.

Plaintiffs argue that their APA claim merely seeks judicial review of the alleged final agency

action set forth in the Plan's effective closure of certain SRAs to drilling operations.  The Court

agrees.  Nowhere in Plaintiffs' complaint do they claim that either the NPS owes them money or that

the Government is otherwise liable to them in contract.  Rather, they claim that the NPS, in

6

promulgating the plan, failed to act consistently with the Enabling Legislation, which provides, in relevant part, that the Secretary of the Interior, in acquiring the surface estate constituting PINS, "shall permit a reservation by the grantor of all or any part of the oil and gas minerals in such land or waters ... with the right of occupation and use of so much of the surface ... as may be required ... incident to the mining or removal of such from beneath the surface." 16 U.S.C. § 459d-3. Although the Court expresses no opinion at this time as to whether the Plan does, in fact, violate this statute, it is satisfied that this is not an action for breach of contract or enforcement of Plaintiffs rights as a third-party beneficiary to a contract between the United States and the State of Texas. Defendants have directed the Court to no authority, and the Court is not otherwise aware of any, holding that Plaintiffs are precluded from maintaining an action under the APA merely because they stand to benefit from the reformation of an agency action to conform to federal law.

## 2. Final Agency Action

Defendants second ground for 12(b)(1) dismissal is that the agency action complained of – the Plan's closure of certain SRA acreage to drilling operations – does not constitute "final agency action." The APA limits judicial review to agency actions made reviewable by statute and "final agency actions." 5 U.S.C. § 704. Final agency actions are actions that must (1) "mark the consummation of  the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow. " *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal citations omitted). For this court to have jurisdiction, the "final agency action" must be "an identifiable action or event." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 899 (1990). Defendants claim that the NPS described and discussed SRAs in the Plan "not to close those areas to oil and gas operations, but to alert operators to particular resource concerns in those areas." Dkt. No. 16 at 12. Moreover, according to Defendants, "[t]he Park Service will consider

a proposal to locate an oil and gas operation in a sensitive resource, although it may require additional mitigation measures before approving such a proposal." *Id.* Finally, Defendants argue that the Plan "was not intended to, and does not, affect any existing private property rights or interests ...." *Id.* The Court disagrees.

This is not the first time that this Court has considered the issue of whether or not portions of the Plan at issue here constitute "final agency action." As Plaintiffs note in their response, this Court was presented with a similar question about the Plan in *Sierra Club v. Norton*, No. C-02-CV-163. That case involved, inter alia, a claim by the Sierra Club for judicial review of the Plan under the APA on grounds that it violated 16 U.S.C. § 1536(a) insofar as it was adopted by the NPS without consulting the U.S. Fish and Wildlife Service. In an Order dated April 17, 2003, this Court noted, much as Defendants argue in their motion here, that the Plan "appears to be little more than a general statement of NPS policy coupled with a collection of governing statutes, regulations, and suggested mitigation measures intended to assist oil companies that are trying to prepare site-specific operation plans." Dkt. No. 66 at 14. This Court proceeded to hold, on the authority of *Exxon Chems. Am. v. Chao*, 298 F.3d 464 (5th Cir. 2002), that the Plan "is not a final agency action because it 'does not adversely affect [the] complainant but only affects his rights adversely on the contingency of future administrative action.'" Dkt. No. 66 at 17 (quoting *Exxon*, 298 F.3d at 467).

However, in a footnote, this Court provided a brief discussion of the treatment of SRAs under the plan as follows: "[o]f course, the portion of the [Plan] completely closing certain SRAs to drilling operations probably constitutes final agency action. Obviously, the Sierra Club does not object to the absolute prohibition of drilling in some areas of [PINS]." Dkt. No. 66 at 17 n.11. On appeal, the Fifth Circuit, in an unpublished opinion, affirmed this Court's holding as to the Plan in its entirety, but also noted with agreement in dicta that the Plan "does completely close some Sensitive Resource Areas

to drilling and exploration activities." *Sierra Club v. Norton*, 74 Fed. Appx. 376, 380 (5th Cir. 2003).

Based on the dicta in this Court's previous review of the Plan, along with the Fifth Circuit's persuasive – though admittedly not mandatory because the opinion was unpublished – approval, this Court is of the opinion that the application of the strictest operating restrictions in the SRAs so as to, in the words of the Plan "effectively close" those areas to drilling operations, does constitute "final agency action" under the APA. The description of the SRAs in the Plan does not, as Defendants argue, merely "alert operators to particular resource concerns." Rather, the Plan affirmatively states that some SRA acreage will not be eligible for drilling operations under any circumstances.

Such a conclusion as the Court reaches here does not contradict any of the cases cited by Defendants. In *Sierra Club v. Peterson*, 228 F.3d 559 (5th Cir. 2000), the Fifth Circuit held that the Sierra Club had not challenged a final agency action when it filed a claim under the APA against the U.S. Forest Service and others seeking "wholesale ... improvement of the Forest Service's 'program' of timber management in the Texas forests." *Id.* at 566 (citations omitted). The club's claim, according to the court, was "precisely the type of programmatic challenge that the Supreme Court struck down in *Lujan*." *Id.* (referencing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871 (1990). The claim asserted by Plaintiffs here, however, is not a broad-based "programmatic challenge." Rather, it is targeted at the Plan's specific and, by the Plan's affirmative terms, definitive closure of SRA acreage to drilling operations.

Nor do the descriptions in the Plan of how the NPS applied operating restrictions to the SRAs lack the requirement, as set forth in *Cntr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798 (D.C. Cir. 2006) (hereinafter "*NTHSA*"), that final agency action "mark the consummation of the agency's decisionmaking process *and* either determine rights or obligations or result in legal consequences." *Id.* at 807 (citing *Bennett*, 520 U.S. at 178). The alleged agency action in the *NHTSA*

9

case was a set of guidelines promulgated by the defendant regarding when it was and was not "appropriate" for automakers to institute voluntary recalls for defects caused by atypical climatic conditions. *Id.* at 803. The D.C. Circuit held that although it was possible to view the guidelines as marking, in the words of the *Bennett* court, "the consummation of the agency's decisionmaking process," it was not reasonable under *Bennett* to conclude that the guidelines "determine[d] rights or obligations or result[ed] in legal consequences." *Id.* at 807–08. Even though the guidelines clearly "reflect[ed] NHTSA's view on the legality of regional recalls," the court concluded that they failed the *Bennett* test because they did not in any way alter the legal character of any particular automaker's recall.

Just as in the *NHTSA* case, the Plan here is, for the most part, a broad statement of how the NPS would manage oil and gas exploration in PINS. However, that does not vitiate the import of the Plan's discussion of SRAs and the manner in which the operating restrictions applied to them. The sections of the plan dealing with SRAs are not presented as the opinion of the NPS and are not couched in advisory language. Rather, the SRAs are listed summarily in a table adjacent to which the NPS states that some combination of operating restriction such as NSO (No Surface Occupancy), NSA (No Surface Access), and NSD (No Surface Disturbance), applied. Dkt. No. 24-2 at 10–11. Moreover, the chart in the Plan is not presented as predicting how the NPS might apply operating restrictions to SRAs in the future, but, rather, how they were applying them as of the date of the Plan's publication in March 2001.

Defendants also cite *Wilderness Society v. Norton*, 434 F.3d 584 (D.C. Cir. 2006) for the proposition that, in addition to weighing the factors relied upon by the courts in the *Sierra Club* and *NHTSA* cases, it was also permissible to look to "the agency's own characterization of the action ... [and] whether the action was published in the Federal Register or the Code of Federal Regulations ...."

*Id.* at 595.  *See also Dow Chemical v. Environmental Protection Agency*, 832 F.2d 319, 324–25 (5th Cir. 1987) (citing *City of Seabrook v. Costle*, 659 F.2d 1371 (5th Cir. 1981), for the proposition that publication in the Federal Register was factor in determination of "final agency action").

Although, the second factor listed by the *Wilderness Society* court focuses on whether the alleged "final agency action" was published in either the Rederal Register or the Code of Federal Regulations, the court noted that "[t]he real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations, which ... contain[s] only documents having ... legal effect ...." *Id.*  Plaintiffs, in their response, note that the NPS announced its intent to draft the Plan in the Federal Register, *See* 62 Fed. Reg. 31622 (1997), as well as its completion, *see* 65 Fed. Reg. 11575 (2000).  Plaintiffs do not claim that the Plan or any parts of it were published in the Code of Federal Regulations and the Court is not otherwise aware that it was; however, Plaintiffs do note that the adoption of the plan by the NPS was also reported in the Federal Register as a summary Record of Decision (ROD).  *See* 65 Fed. Reg. 60678–60681 (2000).  This Court finds the summary ROD highly persuasive.

In the summary ROD, John A. King, NPS Director of the Intermountain Region, describes the Plan as the "Final Oil and Gas Management Plan/Environmental Impact Statement for Padre Island National Seashore in Texas."  *Id.* at 60678.  As an initial observation, the Court notes the dual nomenclature used by King to refer to the Plan both as the "Final Oil and Gas Management Plan" and as an "Environmental Impact Statement" (EIS).  He goes on to note that the summary ROD provides a "statement of the decision made; a summary of the 3 alternatives analyzed in the EIS; ... [and] the decision rationale used in selecting the alternative ...." *Id.*  One of the "alternatives" – indeed, the one chosen by the NPS – is referred to as "Preferred Alternative (Alternative A)".  *Id.* at 60680.  This preferred alternative is described as the formal designation of SRAs and the prescription of "specific

protections," some of which will result in "closures" as "described in Table 2.3 ... of the final plan."
*Id.*  Finally, King states that "[t]his Record of Decision <u>adopts</u> and <u>approves</u> for immediate implementation Alternative A, the (Preferred Alternative)."  *Id.* at 60679 (emphasis added).

It is difficult for the Court to interpret this language in the summary ROD as anything other than "final agency action."  It is not, however, clear to the Court, nor has either party provided guidance as to, what significance should be attributed to King's alternative reference to the Plan in the summary ROD as an "Environmental Impact Statement."  Nor is it clear to the Court how to interpret King's statement in the summary ROD that "[f]rom this planning effort, a final plan will be prepared that describes the overall approaches to be implemented over the next 15 to 20 years to manage the ... development of nonfederal oil and gas underlying" PINS.  *Id.* at 60679.  In other words, it is not evident from the record before the Court whether the Plan appended as an exhibit to Plaintiffs' response <u>is</u> the EIS on which the summary ROD was based, whether it is, in fact, the "final plan" referred to by King that was to <u>come after</u> the summary ROD and was to be based on the EIS, or whether it is both, as signaled by King's reference to the "Final Oil and Gas Management Plan/Environmental Impact Statement for Padre Island National Seashore in Texas.".

This inquiry is potentially germane to the Court's analysis because some circuit courts have held that a final EIS constitutes "final agency action."  *See Southwest Williamson County Community Assoc., Inc. v. Slater*, 173 F.3d 1033, 1036 (6th Cir. 1999) (noting that "a final EIS or the record of decision issued thereon constituted final agency action"); *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (6th Cir. 2006) (noting "well settled" proposition that final EIS or record of decision thereon constitutes "final agency action"); *Jersey Heights Neighborhood Assoc. v. Glendening*, 174 F.3d 180, 187 (4th Cir. 1999) (holding that "designation of the ROD as final agency action under the APA is generally recognized").  The Court was unable to find any Fifth Circuit cases subscribing to

this view; however, at least one district court in this District has held that it was precluded from finding "final agency action" in an EIS because it was not final and had not yet been issued. *Center for Marine Conservation v. Brown*, 917 F. Supp. 1128, 1150 (S.D. Tex. 1996) (Kent, J.). In any event, the answer to the question of whether the Plan or the summary ROD should be construed as a final EIS under the cases cited herein is not dispositive. It is sufficient to say that the language used by King in the summary ROD does persuade the Court that the mere fact that the Plan was not published, as it does not seem to have been, in the Code of Federal Regulations does not doom its classification as "final agency action."

The other three cases cited by Defendants focus on determining whether the alleged final agency action marks, in the words of the *Bennett* opinion, "the consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 154. *See National Assoc. of Home Builders v. Norton*, 415 F.3d 8 (D.C. Cir. 2005); *Homebuilders Assoc. of Greater Chicago v. U.S. Army Corps of Engineers*, 335 F.3d 607 (7th Cir. 2003); *Chemical Mfrs. Assoc. v. Environmental Protection Agency*, 26 F.Supp.2d 180 (D. D.C. 1998). However, based on the description of the planning history set forth in the plan, the Court is satisfied that this element for "final agency action" is also present here. For instance, the Plan notes that public comment was requested, that a "public scoping" newsletter was mailed, that an open house was held in Corpus Christi, that comment letters were received and reviewed, and that a second newsletter was mailed summarizing the open house and the comment letters. 24-2 at 5. Based on the foregoing, the Court concludes that the Plan does, in fact, mark the consummation of the agency's decisionmaking process for purposes of establishing "final agency action" as to the portions of the Plan specifically related to the application of operating restrictions to the SRAs.

13

## Conclusion

The Court is satisfied that neither of the two grounds presented by Defendants merit dismissal under Rule 12(b)(1).  Defendants' sovereign immunity argument fails because Plaintiffs' have not asserted a breach of contract claim in their complaint, but have instead asserted their claim under the APA, which explicitly waives sovereign immunity for judicial review of " final agency actions."  Nor have Defendants' convinced the Court that the Plan – insofar as it closes certain SRA acreage to drilling operations – is not a "final agency action" under the APA.  The Court notes that the vast majority of the Plan is devoted, just as Defendants argue, to general statement of NPS policy regarding nonfederal oil and gas development and exploration.  However, the narrow provisions of the Plan for which Plaintiffs have sought judicial review under the APA are not general statements or guidelines. Instead, the provisions of the Plan closing SRA acreage to drilling operations appear to be definitive statements of actions taken by the NPS to permanently close parts of the Park to drilling activities. Accordingly, and based on the foregoing, the Court is of the opinion that Defendants' motion should be, and hereby is, DENIED.

It is so ORDERED.

Signed this 31st day of March, 2007.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

14