### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| **DUNN-McCAMPBELL ROYALTY** | § | |
| **INTEREST, INC., et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO. V-06-59** |
| **v.** | § | |
| | § | |
| **NATIONAL PARK SERVICE, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

### MEMORANDUM OPINION & ORDER

Pending before the Court are Defendants' Amended Motion for Summary Judgment (Dkt. No. 29) and Plaintiffs' Cross-Motion for Summary Judgment (Dkt. No. 26). Defendants urge the Court to dismiss the Plaintiffs' claim as barred by res judicata. Conversely, Plaintiffs seek summary judgment challenging Defendants' authority to promulgate and apply regulations governing the Padre Island National Seashore ("PINS" or "the Park"). Having reviewed the motions, the responses thereto, the entire record including the relevant amicus curiae briefs and the applicable law, the Court is of the opinion that Defendants' motion should be denied and Plaintiffs' be granted in part and denied in part.

### Background

#### 1. Legislative Background

##### A. National Park Service Organic Act

In 1916, Congress created the National Park System ("NPS" or "Park Service") by enacting the National Park Service Organic Act ("Organic Act"). 16 U.S.C. § 1 *et seq*. Section 1 of the Organic Act recognizes the purpose of the National Park system as follows: "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the

same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." *Id.* at § 1. The Organic Act designates the Secretary of the Interior ("Secretary") to apply this policy. The Act grants the Secretary the authority to "make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service." *Id.* at § 3.

### B. Padre Island National Seashore Enabling Legislation

In 1962, in accordance with the Organic Act, Congress passed the Padre Island National Seashore Enabling Legislation ("Enabling Act") creating a national park at PINS. 16 U.S.C. § 459d *et seq*. The stated purpose of the Enabling Act is to "save and preserve, for purposes of public recreation, benefit, and inspiration, a portion of the diminishing seashore of the United States that remains and is to remain undeveloped." *Id.* at § 459d. The Enabling Act authorizes the Secretary to acquire interests in PINS and requires the Secretary to administer those interests in conjunction with the objectives established under the Organic Act. *Id.* at §§ 459d-1, 459d-4. The enabling legislation also stipulates that mineral rights within the Park are retained by the original grantors of the property, and provisions exist for mineral recovery. *Id.* at § 459d-3.

### C. Texas Consent Statute

In 1963, Texas lawmakers passed legislation granting the federal government permission to acquire the state-owned surface estate. TEX. CIV. STAT. ANN. art. 6077t (Vernon 1970). The consent statute ("Texas Consent Statute") codifies the boundaries of the Park and specifically requires concurrent jurisdiction over all civil and criminal process, the right to levy and collect taxes and the

right to vote. *Id.* at § 3. The Texas Consent Statute "ceded"[1] the land to the United States on the condition that the federal purchase would not deprive the grantor, or its successor in title, of the right of ingress and egress to the mineral estate. *Id.* at § 6. In return, the federal government agreed "for the purpose of a recreation area," to "establish and maintain the land . . . as a National Seashore area." *Id.* at § 1.

### D. 9B Regulations

In 1979, pursuant to the Organic Act, the Secretary promulgated regulations ("the 9B Regulations") to govern nonfederally owned oil and gas operations in all National Park System units that are accessed through federally-owned lands or water. 36 C.F.R. § 9.36(a). The 9B Regulations provide a system-wide regulatory framework governing the exercise of nonfederal oil and gas rights. *Id.* The 9B regulations are not at issue in this challenge. However, the Plaintiffs previously challenged the regulations in a 1995 suit in the Southern District of Texas ("the 1995 Suit"). *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 964 F. Supp. 1125 (S.D. Tex. 1995). As discussed below, the Plaintiffs' claim was dismissed based on a statute of limitations bar. *Id.* at 1132-33. The ruling was later upheld on appeal. *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997).

### E. 2001 Oil and Gas Management Plan

In March 2001, after a considerable gestation period, the Park Service promulgated a document titled "Oil and Gas Management Plan," the stated purpose of which is to "describe[] the overall approaches that will be implemented over the next 15 to 20 years . . . to manage existing and

---

[1] Under such "consent to purchase" agreements, states are said to cede their property over to the United States, whereby such property becomes a federal enclave. *See James v. Dravco Contracting Co.*, 302 U.S. 134, 142 (1937); *Lord v. Local Union No. 2088, Int'l Bhd. of Elec. Workers*, 646 F.2d 1057, 1059 (5th Cir. 1981); *Swords to Plowshares v. Kemp*, 423 F. Supp. 2d 1031,1034-38 (N.D. Cal. 2005).

anticipated oil and gas operations . . . of nonfederal oil and gas underlying Padre Island National Seashore." Dkt. 26-C at 4 (hereinafter "the 2001 Plan"). In general, the 2001 Plan presents a comprehensive collection of laws, goals, considerations and permitting conditions under which the NPS will evaluate proposals by private operators to extract and develop oil and gas resources from the mineral estate beneath PINS.[2] More specifically, the second chapter of the 2001 Plan includes a section describing what are referred to as Sensitive Resource Areas ("SRAs"). These SRAs subject some Park areas to much stricter access, exploration and development restrictions. Unlike the 9B Regulations, which applied to the entire park service system, the 2001 Plan was issued by the Park Service to pertain exclusively to PINS.

### F. 2005 Energy Policy Act

In 2005, Congress passed the Energy Policy Act ("2005 Energy Policy Act"). Public Law 109-58 § 1 *et seq.*, 119 Stat 594 (Aug. 8, 2005). In the 2005 Energy Policy Act, Congress promulgated findings and sense of Congress provisions asserting congressional opinion of PINS and its related enabling legislation. *Id.* at §373(a)(2). Expressly referring to the Enabling Act passed 43 years earlier, Congress found that the federal government never owned the subjacent mineral estate and expressed its "sense" that determinations regarding mineral interests underlying PINS should be made as if those lands retained their pre-Park status.

---

[2] These regulations require a prospective operator to submit a proposed Plan of Operations to the NPS for review and approval. An Environmental Assessment ("EA") is prepared and potential alternatives are addressed. The documents then undergo a 30-day public and agency review and comment period. Based on the EA and the public comments, the Regional Director determines whether approval of the proposed Plan of Operations is a major federal action significantly affecting the environment.

**2. Previous Related Challenges**

    **A. 1995 Suit**

In 1994, Plaintiffs filed suit against Defendants contesting the legality of Defendants' 9B Regulations. *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 964 F. Supp. 1125, 1133-37 (S.D. Tex. 1995). The parties filed competing motions for summary judgment. *Id.*  In an order dismissing the Plaintiffs' action, the United Stated District Court for the Southern District of Texas, Corpus Christi Division ("the District Court") held that, as an initial matter, the challenge to the Park Service's regulations was time-barred because it was not filed within the six year statute of limitations applicable to civil actions against the federal government. *Id.* at 1132-33. The District Court further found, that even assuming the challenge was timely, it would nonetheless fail because the 9B Regulations constituted a valid exercise of NPS authority. *Id.* at 1132-38. The court also held that to the extent Plaintiffs' state law claims conflicted with federal authority, they must yield under the Supremacy Clause. *Id.* at 1138-39. Finally, the District Court transferred the Plaintiffs' takings claims to the Court of Federal Claims. *Id.* at 1139.

    **B. Appellate Review**

In 1997, the Court of Appeals for the Fifth Circuit affirmed the District's Court's decision. *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997). A majority of the appellate panel agreed that Plaintiffs' facial challenge to the regulations was barred by the six year statute of limitations. *Id.* In addition, the court found that there was no proper "as applied" challenge to the regulations before it because the Park Service had taken no action against the owner. *Id.* at 1288. Consequently, the court found it unnecessary to reach the issue of the Park Service's authority to regulate the surface use. *Id.*

**3. Facts**

Both parties included in their motions and briefs substantially consistent and extensive histories of this dispute along with the title and statutory sources of the tracts of real property combined to form PINS, which traverses parts of Kleberg, Kenedy and Willacy counties along the lower Texas Gulf Coast. Plaintiffs are the owners of a mineral estate underneath substantial portions of the Park. P.F. Dunn, Plaintiffs' predecessor-in-title, owned both the surface and mineral estates. In 1926, P.F. Dunn conveyed the surface estate to third parties subject to a reservation of the mineral estate together with the rights of ingress and egress.

The NPS now owns parts of the surface estate overlying Plaintiffs' mineral estate pursuant to the Texas and federal laws described above and a deed that conveyed the surface estate from the State of Texas to the United States for the establishment of PINS. The deed, which was accepted by the federal government after the Enabling Act and Texas Consent Statute were passed into law, essentially reiterates the restrictions and conditions found in the Texas Consent Statute. *See* Dkt. No. 26, Ex. B. From 1963 to 1965, moreover, the United States acquired by deed from third parties the remainder of the surface estate that comprises the Park, which includes portions that overlie Plaintiffs' mineral estate.

Decades later, the NPS promulgated the 2001 Plan identifying and describing numerous SRAs. Dkt. No. 26, Ex. C at 9. SRAs are defined in the Plan's glossary as "[l]ocations of particularly rare and/or vulnerable resources identified by the [Environmental Impact Study] team." *Id.* at 176. The Plan specifies various SRAs comprising 68,731 acres, or 52.7 percent of the surface area within the Park. *Id.* at 9. The Plan also announces that certain "operating restrictions" will be tailored and applied to each SRA "to avoid or minimize potential adverse impacts from specific types of oil and

6

gas operations, including geophysical exploration[,] . . . well drilling, treatment and storage . . . operations, and construction and maintenance of roads and pipelines." *Id.* The operating restrictions employed by the 2001 Plan are referred to, alone or in various combinations, as "No Surface Disturbance, No Surface Occupancy, No Surface Access, and Timing Stipulations." *Id.* The 2001 Plan includes a table identifying the SRAs with the operating restrictions applicable to each. *Id.* at 10-11.

Although the 2001 Plan contains a disclaimer that it cannot effect a substantive change to the laws and regulations governing the management of park service resources, the Park Service was blunt in describing the cumulative effect of applying the various operating restrictions in certain combinations within the SRAs. For instance, the Plan notes that "[s]pecific operating restrictions applied to SRAs will effectively close surface use on . . . 9,941 acres (7.6% of the park) to drilling operations."[3] *Id.* at 9. The Plan also lists portions of the Park's surface that will be closed to geophysical exploration, construction and maintenance of new pipelines and siting new treatment and storage facilities. Thus, it is clear that the implementation of SRA operating restrictions does in fact foreclose the use of significant surface acreage within PINS for the production of oil and gas.

However, as this Court has previously noted, even though the Plan "effectively close[s]" some surface acreage to drilling operations, the Plan does not specifically preclude using other methods, such as directional drilling, to access minerals below the surface of restricted SRAs from unrestricted non-SRA areas consistent with other laws and regulations. The Plan notes, for instance,

---

[3] The NPS apparently reached this conclusion by aggregating the total acreage of SRA to which the No Surface Disturbance, No Surface Occupancy or No Surface Access operating restrictions are applied. The Plan also notes that operating restrictions effectively close surface use on 1,316 acres to geophysical exploration; 9,202 acres to construction and maintenance of new pipelines; 4,810 acres to construction and maintenance of new roads; and all 68,731 SRA acreage to siting new treatment and storage facilities.

that "[u]nder the oil and gas management plan, all oil and gas would be accessible," while conceding that "[t]here would be increased costs for operators to design operations to avoid or reduce impacts to SRAs. In particular, directional drilling . . . under SRAs may need to be used where No Surface Occupancy or No Surface Disturbance is specified." *Id.* at 121–22. Plaintiffs argue, however, that, in at least some areas, this availability of other feasible methods of extraction would be so cost prohibitive that it effectively closes portions, if not all, of the Park to oil and gas exploration and development. However, the fact that drilling in restricted SRAs might be possible—even if not economically viable—is of no bearing to the Court's analysis, since the question presented by Plaintiffs' Cross-Motion for Summary Judgment is whether Defendants promulgation and application of rules is permissible, not whether a theoretical workaround is available to Plaintiffs or whether the Plan itself allows for viable drilling alternatives.[4]

Plaintiffs' Complaint presents a single cause of action under § 706 of the Administrative Procedures Act ("APA"). *See* 5 U.S.C. § 706(2). Specifically, Plaintiffs claim that their rights of ingress and egress to the surface above their mineral estates is recognized and provided for by the Enabling Act and Texas Consent Statute which authorized the United States to acquire the surface estate from the State of Texas, and that the closure by the NPS of certain SRAs is subject to judicial review because it was "arbitrary, capricious, and an abuse of discretion, and otherwise not in accordance with the law" and is in "excess of the Park Service's statutory jurisdiction and authority" as provided by the enabling legislation. Dkt. No. 11 ¶ 30 (borrowing language from 5 U.S.C. § 706(2)(a) & (c)). Plaintiffs accordingly seek a declaration that the portions of the 2001 Plan that

---

[4] The Court, however, notes that other oil companies have proposed Plans of Operations in the Park even after the implementation of 2001 Plan and have successfully received site-specific drilling permits. *See Sierra Club v. Norton*, No. 03-40710, 2003 WL 22018886, at *1-2 (5th Cir. Aug. 27, 2003).

render certain areas of the Park off-limits to oil and gas operations are invalid.

Defendants argue that the Plaintiffs' claim is barred as res judicata because the District Court previously entertained and ruled on a challenge to the Park Service's authority to promulgate and apply regulations governing oil and gas development underneath the Park. Plaintiffs assert that Congress, via the Enabling Act, expressly exempted Plaintiffs' mineral estate from regulation. Additionally, Plaintiffs contend that the federal government agreed to relinquish the authority to regulate Plaintiffs' mineral estate in order to acquire the state lands comprising PINS and that, by doing so, the Texas Consent Statute—which they argue precludes federal regulation of their mineral estate—has been incorporated into federal law.

## Standard of Review

A summary judgment shall be issued if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Hall v. Thomas*, 190 F.3d 693, 695 (5th Cir. 1999). In considering a motion for summary judgment, the Court construes factual controversies in the light most favorable to the non-movant, but only if both parties have introduced evidence showing that an actual controversy exists. *Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998). The burden is on the movant to convince the court that no genuine issue of material fact exists as to the claims asserted by the non-movant, but the movant is not required to negate elements of the non-movant's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The non-moving party may not rest solely on its pleadings. *King v. Chide*, 974 F.2d 653, 656 (5th Cir. 1992). For issues on which the non-movant will bear the burden of proof at trial, that party must produce summary judgment evidence and designate specific facts which indicate that there is

9

a genuine issue for trial. *Celotex*, 477 U.S. at 322; *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To meet its burden, the non-moving party must present "significant probative" evidence indicating that there is a triable issue of fact. *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1995). If the evidence rebutting the summary judgment motion is only colorable or not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-50 (1986).

## Discussion

### 1. Res Judicata

Defendants assert that the District Court's granting of summary judgment and dismissal of Plaintiffs' claims in the 1995 Suit was a dismissal on the merits barring later litigation of the same issues. The preclusive effect of an antecedent federal court judgment is controlled by the res judicata doctrine.  *See Agrilectric Power Partners, Ltd. v. Gen. Elec. Co.*, 20 F.3d 663, 664 (5th Cir. 1995); *Steve D. Thompson Trucking, Inc. v. Dorsey Trailers, Inc.*, 870 F.2d 1044, 1045 (5th Cir. 1989). Res judicata is appropriate if : (1) the parties to both actions are identical or in privity; (2) the judgment in the first action is rendered by a court of competent jurisdiction; (3) the first action issued a final judgment on the merits; and (4) the same claim or cause of action is involved in both suits. *See United States v. Shanbaum*, 10 F.3d 305, 310 (5th Cir. 1995); *Stevenson v. Int'l Paper Co.,* 516 F.2d 103, 108 (5th Cir. 1975). The first two elements are not disputed.

Plaintiffs advance several theories challenging a res judicata bar to its claim, expressly: (1) the District Court's order has no binding res judicata effect due to the court's lack of subject matter

jurisdiction to rule on the merits; (2) the District Court's order cannot preclude a challenge to the subsequently issued 2001 Plan; and (3) any preclusive effect of the District Court's order would not bar its claim because of intervening changes in the law. However, only the Plaintiffs' first argument need be considered by the Court because it is dispositive of the initial issue at hand.

Per the doctrine of claim preclusion, a "final judgment *on the merits* of an action precludes the parties or their privies from relitigating issues that were or could have been raised in [the preceding] action." *Federated Dep't Stores v. Moite*, 452 U.S. 394, 398 (1981) (emphasis added). Pivotal to evaluating whether res judicata bars subsequent litigation over previously adjudicated issues is the determination that the prior judgment was indeed on the merits. Plaintiffs' contend that the District Court's order does not bar their current claim because, once ruling on statute of limitations grounds, the court lacked subject matter jurisdiction to rule on the merits, and thus the District Court's decision was in fact not on the merits for res judicata purposes.

As Defendants point out, similar arguments have previously been put before the Fifth Circuit and rejected. *See Ellis v. Amex Life Ins., Co.*, 211 F.3d 935 (5th Cir. 2000); *Nilsen v. City of Moss Point, Miss.*, 701 F.2d 556 (5th Cir. 1983). In *Ellis*, the Fifth Circuit considered whether a dismissal of a claim based on a time-bar was a decision on the merits. *Ellis*, 211 F.3d at 937. The court, citing numerous prior cases, concisely held that the dismissal of a suit based on a statute of limitations bar is a decision on the merits. *Id.* In *Nilsen*, the Fifth Circuit delved into greater detail to determine whether a dismissal based on limitations serves as a dismissal on the merits. *Nilsen*, 701 F.2d at 562. The *Nilsen* court concluded that "[d]ismissals for want of jurisdiction are not decisions on the merits, while those based on limitations are." *Id.*

In the context of sovereign immunity, however, limitations and jurisdictional bars are more

11

closely related than in other legal contexts. Plaintiffs look to the Fifth Circuit's decision on appeal as the basis for their contention that the limitations dismissals by the District Court and Fifth Circuit were, more accurately portrayed, jurisdictional dismissals preempting a binding merits review. Reviewing the District Court's decision, the Fifth Circuit stated:

> Under established principles of sovereign immunity, the United States is immune from suit unless it consents, and *the terms of its consent circumscribe our jurisdiction*. The applicable statute of limitations is one such term of consent, and failure to sue the United Stated within the limitations period is not merely a waivable defense. *It operates to deprive the federal courts of jurisdiction*.

*Dunn-McCampbell*, 112 F.3d at 1287 (citing *Sisseton-Wahpeton Sioux Tribe v. United States*, 895 F.2d 588, 592 (9th Cir.), *cert. denied*, 498 U.S. 824 (1990)) (emphasis added).

In response to this language, Defendants again look to *Nilsen*. In *Nilsen*, the Fifth Circuit addressed the issue of whether to view unclear dismissals as based on either jurisdiction or limitations. *Nilsen*, 701 F.2d at 562. The court reasoned that "dismissals for want of jurisdiction are paradigms of non-merits adjudication: they do not at all regard the merits of an action; instead, they merely classify that action, whatever its merits, as one on which the court concerned cannot speak." *Id.* Conversely, "[a] timebar determination . . . assumes or decides that the court could have spoken but refuses to do so beyond declaring the claim to be stale." *Id.*

Defendants argue that in its review of the District Court's ruling, the Fifth Circuit merely chose not to, and thus was not barred from, addressing the merits of the Park Service's authority to promulgate regulations because doing so would not be necessary based on the time bar. *Dunn-McCampbell*, 112 F.3d at 1287-88. The Court does not agree. After reviewing the Fifth Circuit's opinion and the cases cited in support thereof, the Court finds it clear that both the Circuit and District Court were without jurisdiction to consider the merits based on a jurisdictional bar.

12

However, to the extent the Fifth Circuit did not with sufficient clarity declare itself or the District Court unable to review the merits because of the jurisdictional bar, another Fifth Circuit opinion is instructive.

Indeed, *United States v. One Red Chevrolet Impala Sedan Serial No. 11837A177369*, sheds further light on whether the Fifth Circuit's review recognized the District Court's lack of jurisdiction to entertain the *Dunn-McCampbell* claim on the merits.  457 F.2d 1353 (5th Cir. 1972).  In *One Red Chevrolet*, the Fifth Circuit considered whether a defendant was entitled to the return of his property forfeited to the United States. *Id.* The government raised sovereign immunity and statute of limitations defenses. *Id.* at 1357. Holding that the government's statute of limitations bar was a restriction that deprived the district court of jurisdiction, the court announced "[f]ailure to bring an action within the time specified under the Tucker Act does not merely provide the government with a waivable defense to the action, but *deprives the district court of jurisdiction to hear the action at all.*" *Id.* (relying on *Gallion v. United States*, 389 F.2d 522 (5th Cir. 1968)) (emphasis added). Although the *One Red Chevrolet* court went on to deny the statute of limitations defense because the court found the claim was brought timely, the court's concise statement regarding jurisdiction requires this Court to read the Fifth Circuit's review of the District Court's decision as a jurisdictional ruling.

Once seen in this light, the Federal Rules and previous Fifth Circuit precedent clearly provide that dismissals for want of jurisdiction are not decisions on the merits and thus have no res judicata effect. *See* FED. R. CIV. P. 41(b) ("a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits"); RESTATMENT (SECOND) JUDGMENTS §20(1) cmt. d (proclaiming "a dismissal [for lack of jurisdiction, venue, or

13

non joinder] is so plainly based on a threshold determination" that even if the judgment purports to bar further litigation, it should ordinarily be of no effect); *see also Stanley v. Central Intelligence Agency*, 639 F.2d 1146, 1157 (5th Cir. 1981) ("[w]hen a court must dismiss a case for lack of jurisdiction, the court should not adjudicate the merits of the claim").

Thus, while the Fifth Circuit's *Dunn-McCampbell* decision was, on its face, based on a limitations bar, such a bar, in the context of sovereign immunity waivers by the United States, lead to a lack of jurisdiction for the District Court to have ruled on the merits. Accordingly, the District Court's decision was not final on the merits and the Plaintiffs' present challenge is not subject to res judicata. Defendants' Motion for Summary Judgment based on res judicata is therefore denied.

## 2. Defendants' Authority to Promulgate and Apply Regulations Governing the Park

### A. Administrative Procedures Act

Administrative agencies charged with implementing a statute have primary responsibility for determining the scope of their authority. *Batterton v. Francis*, 432 U.S. 416, 425 (1977); *Western Coal Traffic League v. United States*, 694 F.2d 378, 383-84 (5th Cir. 1982), on reh'g, 719 F.2d 772 (5th Cir. 1983). Although a reviewing court is not free to set aside agency regulations merely because it may have interpreted the statute in a different manner, the APA requires courts to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or implemented in excess of statutory authority. *Id.*; 5 U.S.C. § 706(2)(a) & (c). When adopting regulations to implement a congressional mandate, moreover, agency interpretations of a statute are entitled to great weight. *Batterton*, 432 U.S. at 425; *Western Coal*, 694 F.2d at 383-84; *see also Nat'l Hand Tool Corp. v. Pasquarell*, 889 F.2d 1472, 1475 (5th Cir. 1989) (agencies are entitled to considerable deference in their interpretation of

governing statutes).

Under the APA, a plaintiff may raise either a "facial" challenge to the promulgation of regulations by an agency, or an "as applied" challenge to regulations when they are applied in a final agency action.[5] 5 U.S.C. § 702, *et. seq.*; *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997). Thus, Plaintiffs may appropriately challenge the NPS's 2001 Plan under the APA, and this Court has federal question jurisdiction under 28 U.S.C. § 1331. *See Veldhoen v. U.S. Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1995); *Western Coal*, 694 F.2d at 383.

Plaintiffs, in hopes of informing this Court's interpretations of the Enabling Act and Texas Consent Statute, largely rely on the 2005 Energy Policy Act. Plaintiffs maintain that the findings and sense of Congress provisions found in the 2005 Energy Policy Act declare Congress's "unambiguous intent" that the Enabling Act and Texas Consent Statute, passed decades earlier, prevent Defendants from promulgating regulations that restrict Plaintiffs' access to the mineral interests underlying the Park. Thus, the Court first turns to the 2005 Energy Policy Act.

### B. 2005 Energy Policy Act

Plaintiffs insist that the sense of Congress provision included in the 2005 Energy Policy Act[6]

---

[5] This Court has previously determined that the SRA portions of the 2001 Plan constitute a "final agency action." *See Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, Civ. A. No. V-06-59, 2007 WL 1032346, at *4-8 (S.D. Tex. March 31, 2007). Although the District Court and Fifth Circuit addressed whether the 9B Regulations were a final agency action in Plaintiffs' 1995 Suit and its review on appeal—and such a determination might preclude an as applied challenge—this Court's previous order on this matter has not been challenged and the Court sees no reason to revisit the issue at this time.

[6] The 2005 Energy Policy Act, in relevant parts, provides the following:

SEC. 373. SENSE OF CONGRESS REGARDING DEVELOPMENT OF MINERALS UNDER PADRE ISLAND NATIONAL SEASHORE.
(a) FINDINGS.—Congress finds the following:
    (1) Pursuant to Public Law 87–712 (16 U.S.C. 459d et seq.; popularly known as the ''Federal Enabling Act'') and various deeds and actions under that Act, the United States is the owner of only the surface estate of certain lands constituting the Padre Island National Seashore.
    (2) Ownership of the oil, gas, and other minerals in the subsurface estate of the lands

"is dispositive of any dispute concerning Congress's intentions" for mineral regulation under PINS.

Dkt. No. 26 ¶ 26. The Court is less certain that the provision carries such weight.

Courts have not formed a consensus as to how to treat post-enactment statements about a statute. *See* William N. Eskridge, Jr., *Overriding Supreme Court Statutory Interpretation Decision*, 101 YALE L.J. 331, 402-05 (1991) (compiling and discussing cases that illustrate conflicting approaches and noting the rising controversy over the persuasive authority attributed to subsequent legislative treatment of prior statutes). Even those who advocate the use of subsequent legislative enactments as a means of determining legislative intent acknowledge its faults. *Id.* at 402 (recognizing that courts may invoke the use of such enactments arbitrarily and unreliably). Specifically, jurists dispute whether courts should use post-enactment legislation to effectuate the present Congress's intent or that of the original enacting Congress. *Id.*; *see also  Mackey v. Lanier Collection Agency & Serv.*, 486 U.S. 825, 840 (1988) (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)) ("[t]he views of a subsequent Congress form a hazardous basis for inferring the intent

---

constituting the Padre Island National Seashore was never acquired by the United States, and ownership of those interests is held by the State of Texas and private parties.

(3) Public Law 87–712 (16 U.S.C. 459d et seq.)—

    (A) expressly contemplated that the United States would recognize the ownership and future development of the oil, gas, and other minerals in the subsurface estate of the lands constituting the Padre Island National Seashore by the owners and their mineral lessees; and

    (B) recognized that approval of the State of Texas was required to create Padre Island National Seashore.

(4) Approval was given for the creation of Padre Island National Seashore by the State of Texas through Tex. Rev. Civ. Stat. Ann. Art. 6077(t) (Vernon 1970), which expressly recognized that development of the oil, gas, and other minerals in the subsurface of the lands constituting Padre Island National Seashore would be conducted with full rights of ingress and egress under the laws of the State of Texas.

(b) SENSE OF CONGRESS.—It is the sense of Congress that with regard to Federal law, any regulation of the development of oil, gas, or other minerals in the subsurface of the lands constituting Padre Island National Seashore should be made as if those lands retained the status that the lands had on September 27, 1962.

Public Law 109-58 § 373, 115 Stat 594 (Aug. 8, 2005).

of an earlier one."). This issue seems particularly poignant when the two Congresses are separated by a large span of time, membership or ideology.

In *Mississippi Poultry Association v. Madigan*, the Fifth Circuit dealt with precisely this issue: how does this circuit view subsequent legislative enactments which might speak to legislative intent? 31 F.3d 293, 302-303 (5th Cir. 1994) (en banc). The *Madigan* court noted that "subsequent enactments have been used to give effect to the intent of the current, not the enacting, Congress." *Id.* at 303 n.57. The court continued: "there is authority for the proposition that we should give effect only to the intent of the *enacting* Congress. As we are using [the subsequently enacted statute] here solely for the limited purpose of ascertaining the intent of the [enacting Congress], we decline to take sides in the "originalism"-"present intent" debate." *Id.* (citing Eskridge, *Overriding Supreme Court Statutory Interpretation Decision*, 101 YALE L.J. 331) (1991)). While the Fifth Circuit has not yet "taken sides" as to exactly how subsequent legislative enactments will be applied  or what weight they will be accorded, the court has provided guidance.

The *Madigan* court laid down a pragmatic test instructing that "the proper weight to be accorded such legislation depends on the facts of each case." *Id.* at 303. The court specifically looked to (1) the "substantial overlap in membership" between the Congress that passed the earlier bill and that which passed the later bill; (2) the "close temporal proximity" between the passage of the two statutes; (3) the "unmistakable specificity and directness" with which the later enactment addressed the earlier; and (4) the "alacrity with which Congress responded to" the agency interpretation. *Id.* Notably, the court also took time to mention that even though in this instance it would give "highly persuasive weight" to the later enactment, it would not be bound by it. *Id.*

In *Madigan*, (1) four hundred and thirty-five members of the original enacting Congress were

17

also members of the Congress who passed the subsequent legislation; (2) the two statutes were passed within five years of one another; (3) the later statute specifically mentioned that the relevant intervening regulation issued by the Secretary of Agriculture "does not reflect the intention of the Congress," and (4) Congress's subsequent statute came merely twelve months after the Secretary of Agriculture promulgated the regulation at issue. *Madigan*, 31 F.3d at 302-03. The situation here could not be more converse. In this case, (1) only three members of the Congress that passed the Enabling Act are members of the Congress who passed the 2005 Energy Policy Act;[7] (2) the Energy Policy Act was passed 43 years after the Enabling Act; and (3) the 2005 legislation was passed four years after the promulgation of the 2001 Plan.

Moreover, the 2005 findings and sense of Congress, while explicitly mentioning the Enabling Act, do not seem to the Court as specific a comment on the preceding legislation as that present in *Madigan*. The legislative statement in *Madigan* narrowly pointed to an interpretation of an intervening regulation and, "in plain, direct, and unequivocal language," placed Congress's intent at odds with that of the Secretary of Agriculture. *Id.* at 302. It bears repeating that the subsequent statute in *Madigan* explicitly stated that the intervening regulation issued by the Secretary of Agriculture did not "reflect the intention of the Congress." *Id.* The legislative statement found in the 2005 Energy Policy Act does not, as Plaintiffs claim, provide Congress's clearly juxtaposed intent to the 2001 Plan or the District Court's prior interpretation of the Park Service's authority to promulgate or apply such regulations; in fact, it mentions neither of them. Nowhere in Section 373

---

[7] The Court identified West Virginia's Robert Carlyle Byrd—America's longest-serving senator—and Massachusetts' Edward Moore Kennedy as the sole overlapping members of the two Senates, and Michigan's John David Dingell, Jr. as the only overlapping member of the House of Representatives. *See* Longest Serving Senators, http://www.senate.gov/pagelayout/reference/four_column_table/Longest_Serving_Senators.htm (last visited Sept 12, 2007); John David Dingell, Jr. Biographical information Page, http://bioguide.congress.gov/scripts/biodisplay.pl?index=D000355 (last visited Sept. 12, 2007).

does the 2005 Congress even use the word "intent." *Id.* Thus, based on the factors set forth in *Madigan*, this Court is inclined to give the 2005 Energy Policy Act little, if any, persuasive weight.

While *Madigan* provides solid ground to place little importance on the Energy Policy Act's findings and sense of Congress, the Court acknowledges that the bill was subjected to the "constitutionally mandated process" of approval by both houses of Congress, and does not disregard its declarations lightly. *Id.* Looking to other Circuits, however, this Court finds similar treatment. In *State Highway Commission of Missouri v. Volpe,* the Eighth Circuit gave little regard to a sense of Congress provision that was included *in the act itself*, not a later legislative enactment. 479 F.2d 1099, 1111 (8th Cir. 1973). The court proclaimed that when interpreting an act, any statement of a "sense of Congress" is not controlling on the issues to be interpreted. *Id.* The court declared that any interpretation "must be gleaned from the language of the act itself." *Id.* In *Yang v. California Department of Social Services*, the Ninth Circuit court observed that senses of Congress merely "buttress interpretations of other mandatory provisions" and "amounts to no more than non-binding, legislative dicta." 183 F.3d 953, 959-61 (9th Cir. 1999) (citing cases). Notably, the court primarily looked to cases in which the sense of Congress was provided for in the original act itself. *Id.* Here, as discussed above, the congressional findings and sense of Congress in the 2005 Energy Policy Act came much later and through a vastly different Congress. In *Fund for Animals, Inc. v. Kempthorne*, the D.C. Circuit largely ignored a sense of Congress because "Congress may or may not be correct in its interpretation of the [act]." 472 F.3d 872, 877 (D.C. Cir. 2006). Like the courts before it, the *Kempthorne* court commented that "[t]he sense of Congress provision does not in any way alter the plain text" of the statute to be interpreted. *Id.*

Plaintiffs cite several cases for the proposition that the sense of Congress should be given

"tremendous weight." Dkt. No. 26 ¶ 27. In *Accardi v. Pennsylvania Railroad Co.*, the Supreme Court looked to and gave some weight to a sense of Congress provision.383 U.S. 225, 229 (1966). However, the Court did not proclaim how much authority the sense of Congress statement provided. *Id.* In fact, the Court had already proclaimed the act in question "clearly manifests a purpose and desire" which it later found to be consistent with the sense of Congress. *Id.* at 228-229. Thus, it seems like the *Accardi* Court did not give much attention to the sense of Congress provision except to bolster its already-established interpretation. In *Connecticut Light & Power v. Federal Power Commission*, the Supreme Court merely stated that congressional policy declarations "cannot be wholly ignored." 324 U.S. 515, 527 (1945). This a far cry from the "tremendous weight" Plaintiffs urge this Court give Section 373. In *Red Lion Broadcasting Co. v. Federal Communication Commission*, the Supreme Court gave great weight to an amendment to an earlier statute in determining the original statute's construction. 395 U.S. 367, 380-81 (1969). Here, Plaintiffs do not contend that the 2005 Energy Policy Act is or acts as an amendment to the Enabling Act. If Congress were to amend the Enabling Act, this Court's view would likely be different, but that is not the case. Thus, the Plaintiffs have directed the Court to no authority, and the Court is not otherwise aware of any, that would compel the Court to give the 2005 Energy Policy Act great persuasive weight.

### C. The 2001 Plan and the Plaintiffs' Mineral Estate

Plaintiffs maintain that Congress, by way of the Enabling Act, specifically exempted Plaintiffs' mineral estate from regulation. Additionally, and in the alternative, Plaintiffs argue that, in order to obtain the state lands constituting the Park, the United States resigned the authority to regulate Plaintiffs' mineral estate. In lieu of federal regulation, Plaintiffs contend that the Texas Consent Statute has been incorporated into federal law and prohibits federal regulations restricting

Plaintiffs' access to its mineral estate.

### i. Express Exemption Under the Enabling Act

Plaintiffs assert that Congress, via the Enabling Act, expressly exempted Plaintiffs' mineral estate from federal regulation.[8] Plaintiffs direct the Court's attention to the Enabling Act, Section 4(b), which states:

> Any acquisition hereunder shall exclude and shall not diminish any right of occupation or use of the surface under grants, leases, or easements, existing on April 11, 1961, which are reasonably necessary for the exploration, development, production, storing, processing, or transporting of oil and gas minerals that are removed from *outside the boundaries* of the national seashore and the Secretary may grant additional rights of occupation or use of the surface for the purposes aforesaid upon the terms and under such regulations as may be prescribed by him.

16 U.S.C. § 459d-3(b) (emphasis added).

Plaintiffs contend that because the surface and mineral estate were severed before the United States acquired the PINS surface estate, their mineral estate lies "outside the boundaries" of PINS and thus, outside federal regulation thereof according to Section 4(b). Plaintiffs claim that*, though its mineral estate underlies PINS*, its minerals are, in a legal sense, outside the boundaries of PINS. Such an interpretation contradicts Congress's statutory design, long-standing case law interpreting similar phrases in a National Park context and this Court's duty to effectuate the Enabling Act's plain meaning.

Section 1 of the Enabling Act describes the Park boundaries solely in lateral terms including

---

[8] Plaintiffs acknowledge that the District Court fully addressed and rejected this argument. They claim, however, that the issue must be revisited because the District Court's decision was reached before the passing of the 2005 Energy Policy Act, and that if the District Court had addressed this issue today, it "would have been required to reach a different result." Dkt. No. 26 ¶ 43 n. 3. As laid out above, this Court does not grant the 2005 Energy Policy Act findings and sense of Congress great authoritative weight. Although this Court disagrees with the Plaintiffs' view that the District Court would be compelled to reach a different result today, as discussed above, this Court believes the District Court's ruling was not on the merits and will address the issue anew. However, this Court agrees with the District Court's analysis and essentially adopts its reasoning.

numerous maps, surveys and natural features. 16 U.S.C. § 459d. Nowhere in Section 1 or elsewhere did Congress indicate that privately-owned interests in such property are outside the boundaries of PINS. Furthermore, in Section 2—which authorizes the Secretary to acquire property—Congress contemplated instances in which privately-owned property would lie within the PINS boundaries. Section 2 reads: "The Secretary . . . is authorized to acquire . . . the land, waters, and other property, and improvements thereon and any interest therein, within the areas described in section 459d of this title or which lie *within the boundaries* of the seashore . . . " 16 U.S.C. § 459d-1 (emphasis added). Congress thus implicitly acknowledged a distinction between establishing the Park boundaries and acquiring title. The language of Section 2 indicates that Congress assumed the PINS boundaries would be established without regard to title ownership of land within the Park's lateral confines. Moreover, the Federal Register Notice establishing the PINS boundaries states that federal civil and criminal jurisdiction extends "over all lands and waters, whether or not federally owned, within the boundaries" set forth in the Enabling Act. 31 Fed. Reg. 9609 (July 15, 1966).

Additionally, courts have long recognized the difference between the statutory boundaries of National Parks and title ownership to property within those boundaries. *See United States v. Stevenson*, 29 F.3d 162, 164 (4th Cir. 1995) (holding that the language "within the limits of said Park" refers to "the statutory boundaries of the Park established by Congress, not to property ownership lines"); *Free Enter. Canoe Renters Ass'n v. Watt*, 711 F.2d 852, 856 (8th Cir. 1983) (observing that the phrase "within the boundaries" "incorporate[s] federal, state, and private land, and . . . makes no distinction on the basis of ownership"); *Macomber v. Bose*, 401 F.2d 545, 547 (9th Cir. 1968) (recognizing that the language "the territory embraces within Glacier National Park" includes "not only the public lands dedicated to park purposes by the United States but all private

owned lands within the described park boundaries"). It is thus clear that when the Enabling Act references the area "within the boundaries," the phrase covers the entire Park area, not just the portions federally-owned.

Plaintiffs argue that this abundance of case law giving effect to the phrase's ordinary meaning is overridden by the 2005 Energy Policy Act and an affidavit supplied by Congressman Joe Kilgore.[9]  Plaintiffs claim that these two sources require that Section 4(b) of the Enabling Act be interpreted in a manner that effectuates Congress's "express statement" that the Plaintiffs' access to its mineral estate not be restricted. However, one of the longest standing cannons of statutory interpretation is that "it is to be assumed that words and phrases are used in their ordinary meaning." *Holy Trinity Church v. United States*, 143 U.S. 457, 463 (1892); *see also FDIC v. Meyer*, 510 U.S. 471, 476 (1994) (observing that in the absence of a statutory definition, "we construe a statutory term in accordance with its ordinary or natural meaning"). In addition to the statutory design and clear proclamations of the phrases' meaning cited above, the ordinary usage of the expression "outside" and "within" the Park "boundaries" does not allow this Court to construe the terms to include some severed horizontal and vertical connotation. The Plaintiffs' claim that "the production of oil and gas beneath the park . . . is just as surely 'outside the boundaries' of PINS as if it was located across a fence" is without merit. Dkt. No. 26¶ 44.

Based on the statutory design, cited case law and plain meaning of the Enabling Act's terms,

_____

[9] Having already dealt with the 2005 Energy Policy Act, this Court wishes to briefly address Congressman Kilgore's affidavit.  Resort to legislative history is only utilized where the statutory language is "inescapably ambiguous". *Garcia v. United States*, 469 U.S. 70, 76 n. 3 (1984) (citing *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384  (1951) (concurring)). The Court does not find the statutory language here ambiguous and resort to legislative history is thus unnecessary. *See Exxon Mobil Corp v. Allapattah Servs.*, 545 U.S. 546, 568 ("As we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material. Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms. Not all extrinsic materials are reliable sources of insight into legislative understandings . . .).

the Court finds that Plaintiffs' mineral estate is located within the boundaries of PINS. Because Section 4(b) only applies to exempt minerals located outside the boundaries of PINS, Section 4(b) does not apply to exempt the Plaintiffs' mineral estate from federal regulation.

Plaintiffs alternatively argue that if Section 4(b) does not apply to its mineral estate, an "anomalous and absurd result" would occur: specifically, that the Enabling Act would not address existing mineral estate owners at all. Dkt. No. 26 ¶ 50. Section 4 of the Enabling Act contains parts (a) and (b). Both parties agree that part (a) does not apply to Plaintiffs' mineral estate.[10] Because part (a) does not apply, and the Court has ruled that part (b) is inapplicable as well, Plaintiffs argue that if Congress wished to allow federal regulation of their mineral estate, Congress would have included *some provision* allowing regulations to apply to the surface overlying Plaintiffs' mineral estate. However, it seems that the Plaintiffs have it backwards: under the scheme developed in the Organic Act, Congress passed specific statutory provisions to exempt particular interests from regulation, not to include them.

In the Organic Act, Congress declared that "the protection, management, and administration . . . [of the areas subject to the National Park system] . . . shall be conducted . . . except as may have been or shall be directly and specifically provided by Congress." 16 U.S.C. § 1a-1. Thus, unless Congress wished to exempt the Plaintiffs' mineral estate from regulation, it would have been

---

[10] Part (a) states: "When acquiring land, waters, or interests therein, the Secretary shall permit a reservation by the grantor of all or any part of the oil and gas minerals in such land or waters and of other minerals therein which can be removed by similar means, with the right of occupation and use of so much of the surface of the land or waters as may be required for all purposes reasonably incident to the mining or removal of such from beneath the surface of these lands and waters and the lands and waters adjacent thereto, under such regulations as may be prescribed by the Secretary with respect to such mining or removal." 16 U.S.C. § 459d-3(a)

The parties agree that part (a) does not apply to Plaintiffs' mineral interest. Part (a) only speaks to a limited protection of mineral interests reserved in a grant to the federal government. Here, the Plaintiffs' mineral interest was severed long before the federal government acquired the surface.

redundant for Congress to include any provision in the Enabling Act that would specifically apply to the Plaintiffs' mineral interests. The Organic Act grants the Secretary power to act unless otherwise provided. Congress would have directly and specifically provided for such an exemption if they wished for one to apply.

Moreover, reliance on congressional silence does not necessarily indicate much by way of congressional intent. As the Supreme Court has explained, it is not safe to assume that Congress can or will address directly and explicitly all issues that may arise:

> As one court has aptly put it, '[n]ot every silence is pregnant.' In some cases, Congress intends silence to rule out a particular statutory application, while in others Congress' silence signifies merely an expectation that nothing more need be said in order to effectuate the relevant legislative objective. In still other instances, silence may reflect the fact that Congress has not considered an issue at all. An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent.

*Burns v. United States*, 501 U.S. 129, 136 (1991) (quoting *Illinois Dep't of Public Aid v. Schweiker*, 707 F.2d 273, 277 (7th Cir. 1983)).

As explained above, Plaintiffs' inference from congressional silence is contrary to the relevant statutory design and thus is without merit. Therefore, the Plaintiffs' argument is unpersuasive and the Enabling Act does not expressly or by implication exempt Plaintiffs' mineral estate from regulation.

### ii. Authority to Promulgate Regulations Under the Texas Consent Statute

Plaintiffs maintain that by restricting Plaintiffs' access to the minerals underlying PINS, Defendants exceeded their authority to promulgate and apply regulations and thus portions of the 2001 Plan are not in accordance with the law. 5 U.S.C. § 706(2)(a) & (c). The crux of Plaintiffs' argument is that the federal government agreed to relinquish such authority in order to acquire the

state lands comprising PINS and that, by doing so, the Texas Consent Statute has been assimilated

into federal law. Plaintiffs contend that the scope of Park Service power over PINS is governed by

the terms of the Texas Consent Statute, and that the Texas law precludes NPS regulation of their

mineral estate as set forth by portions of the 2001 Plan.[11]

The Enabling Act required Texas's concurrence to acquire the state-owned surface estate

contained within the Park's defined lateral boundaries. 16 U.S.C. § 459d-1. The State's concurrence

took the form of the Texas Consent Statute, which conditioned the transfer of the surface estate on

the federal government's respecting the rights of subsurface mineral interest owners. *See* TEX. CIV.

STAT. ANN. art. 6077t §§ 3, 6 (Vernon 1970). In accordance with the Enabling Act and Texas

Consent Statute, Texas then executed a deed, which incorporated the restrictions set forth in the

---

[11] Plaintiffs cites *Colorado v. Toll*, 269 U.S. 228, 229-30 (1925), among other cases, in support of the proposition that the federal government is bound by the terms of the state's cession agreement. *See* Dkt. No. 26 ¶35. As explained further below, the law Plaintiffs set forth is well-settled.

Conversely, Defendants spend much time discussing *Kleppe v. New Mexico*, 426 U.S. 529 (1976). Defendants correctly note that in *Kleppe*, the Supreme Court recognized Congress's broad authority under the Property Clause, declaring "while the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, we have repeatedly observed that '[t]he power over the public land thus entrusted to Congress is without limitations.'" 426 U.S. at 539 (quoting *United Stated v. San Francisco*, 310 U.S. 15, 29 (1940)).

Indeed, *Kleppe* discussed several of the cases Plaintiffs cite, observing that "while Congress can acquire exclusive or partial jurisdiction over lands within a State by the State's consent or cession, the presence or absence of such jurisdiction has nothing to do with Congress' powers under the Property Clause. Absent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause." *Id.* at 542. Writing for the unanimous Court, Justice Marshall made clear that "at most [*Toll*] stands for the proposition that where Congress does not purport to override state power over public lands under the Property Clause *and* where there has been no cession, a federal official lacks power to regulate contrary to state law." *Id.* at 544-45 n.12 (emphasis added).

Defendants reliance on *Kleppe*, however, is misplaced. Plaintiffs are not challenging Congress's constitutional authority to legislate under either the Property Clause or the Enclave Clause. Plaintiffs concede that, pursuant to *Kleppe*, Congress could delegate specific authority to the Department of the Interior to issue broad regulations governing PINS. Dkt. No. 26 ¶37 n.1. Rather, Plaintiffs merely protest Defendants' authority to promulgate portions of the 2001 Plan pursuant to the Enabling Act and Texas Consent Statute. The question presented by Plaintiffs, in other words, is whether the authority granted by properly enacted federal statutes, and limited by the related state cession legislation, provides the Secretary the authority to promulgate regulations of the sort set forth in the 2001 Plan. Because administrative, not congressional, power to act is at issue here, the Court sees no need to address *Kleppe's* treatment of the Property and Enclave Clauses as extensively briefed in Defendants' motions.

Texas Consent Statute and transferred the surface estate to the United States.

It is settled law that when the federal government acquires land in this manner, a state can qualify its cession of land, so long as the qualifications placed on the transfer are not inconsistent with federal law or the federal use for which the land is being acquired. *See Paul v. United States*, 371 U.S. 245, 264 (1963); *Collins v. Yosemite Parl & Curry Co.*, 304 U.S. 518, 528 (1938); *James v. Dravo Contracting Co.*, 302 U.S. 134, 142, 147-48 (1937); *United States v. Unzueta*, 281 U.S. 138, 142 (1930); *Colorado v. Toll*, 269 U.S. 228, 229-30 (1925); *DeKalb County, GA v. Henry C. Beck Co.*, 382 F.2d 992, 994-95 (5th Cir. 1967); *Dep't of Labor and Indus. v. Dirt & Aggregate, Inc.*, 837 Wash. P.2d 1018, 1021 (1992). The scope of federal authority over such ceded land is governed by the terms of the cession agreement. *Id.* As the Supreme Court instructed in *Collins*:

> The States of the Union and the National Government may make mutually satisfactory arrangements as to jurisdiction of territory within their borders and thus in a most effective way, cooperatively adjust problems flowing from our dual system of government. Jurisdiction obtained by consent or cession may be qualified by arrangement or through offer and acceptance or ratification. It is a matter of arrangement. These arrangements the courts will recognize and respect.

*Collins*, 304 U.S. at 528.

State laws incorporated in this manner carry the force of federal law. *See James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 99-100 (1940); *Swords to Plowshares v. Kemp*, 423 F. Supp. 2d 1031,1034-38 (N.D. Cal. 2005). Because the federal government received Texas's consent to acquire state-owned land for the Park, the conditions and restrictions enumerated in the Texas Consent Statute have been assimilated into federal law.

With this is mind, Plaintiffs look to Sections 3 and 6 of the Texas Consent Statute to contend that the Texas Legislature expressly precluded the type of federal regulation of their mineral estate present in this case. Sections 3 and 6, in relevant part, state as follows:

Sec. 3.  The United States of America, through the Secretary of the Interior, is granted permission, *subject to the limitations contained in this Act*, to acquire the area that has been defined as Padre Island National Seashore [pursuant to a deed to be executed forthwith, which will contain the exceptions and reservations delineated in this Act]. . . in consideration of the United States of America agreeing to establish and maintain the [relevant state land] as a National Seashore area . . .

*Said state land shall not be conveyed unless the entire mineral interest is reserved in the state, and unless the right of occupation and use of so much of the surface of the land or waters as may be required for all purposes reasonably incident to the mining, development, or removal of the minerals, is adequately protected.*

In all conveyances of said park property under Sections 3 and 6 hereof to the United States of America, the Secretary of the Interior shall permit a reservation by the grantor of all oil, gas, and other minerals in such land or waters with the right of occupation and *use of so much of the surface of the land* or waters as may be required for the purposes of reasonable development of oil, gas and other minerals, *under such rules and regulations as may be established by the Railroad Commission of the State of Texas.*

Sec. 6  The United States of America, through the Secretary of the Interior, is hereby authorized to purchase, condemn, receive, hold and acquire title to the surface estate of any land not owned by the state in the area above-described as the Padre Island National Seashore for use as a recreational park; provided that the acquisition of lands in such area *shall not deprive the grantor or successor in title of the right of ingress and egress* for the purpose of exploring for, developing, processing, storing and transporting minerals from beneath said lands and waters with the right of housing employees for such purposes. The same reservations and regulations enumerated in Section 3 hereof, relating to civil and criminal jurisdiction, process, levy and collection of taxes, mineral development, and voting rights, shall apply to all lands acquired by the United States of America under this Section.

TEX. CIV. STAT. ANN. art. 6077t at §§ 3, 6 (Vernon 1970) (emphasis added).

Plaintiffs maintain that NPS regulation of their mineral estate provides inadequate protection of their mineral interests and deprives Plaintiffs of the right of ingress and egress to their property, violating the provisions cited above. The portions of the Texas Consent Statute set forth above expressly subject the state's cession upon reservation and protection of the interests of private mineral owners such as Plaintiffs. While the statute clearly provides for concurrent state-federal

28

jurisdiction over all civil and criminal process, the right to levy and collect taxes and the right to vote, as laid out in Section 3's first paragraph, two separate and distinct paragraphs deal with the regulation of mineral interests. The paragraphs pertaining to mineral interests, which the Court presumes were segregated with purpose, do not cede such authority to the federal government or its agencies. In fact, these provisions specifically reserve such authority for the state. Taken together, the Court finds it clear that surface access to private mineral interests was to and should still remain under the control of the State of Texas via the Railroad Commission. *See* TEX. PARKS & WILDLIFE CODE § 23.013. Although Section 3 provides the Department of Interior the opportunity to comment on any proposed regulations promulgated by the Railroad Commission, and generally states that the use of the Park for oil, gas and mineral development purposes "be carried out in such a manner as to not unreasonably interfere with the use of said lands for park purposes," it is clear from the statute that the state is to retain authority over the regulation of access to the subsurface minerals. While such authority may be tempered so that the Railroad Commission does not allow mineral development to unreasonably interfere with the use of the Park, it may not be entirely divested from state control. The Texas Consent Statute, when viewed in whole, reveals that the mineral rights beneath the Park would stay in state and private hands, and the NPS would allow continued surface access to those interests.

As the Supreme Court has stated, "[s]tatutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—[sometimes because] only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Savings Ass'n v. Timbers of Inwood Forest Associates*, 484 U.S. 365, 371 (1988) (citations omitted). Although certain portions of the Texas

Consent Statute could be read to allow for unchecked federal regulation over the surface estate marked by the Park's lateral boundaries, as Defendants appear to contend, the Court concludes that such a reading is inconsistent with the clear intention of the Texas legislature, which is evidenced by the statute's overall scheme. The Texas Consent Statute indicates the state wished to wholly preserve mineral development at PINS, most likely in order to continue to collect the significant royalties and taxes potentially obtained therefrom. In order to achieve this aim, the Texas Consent Statute explicitly curtailed federal authority to promulgate regulations of the sort contained in the contested portions of the 2001 Plan.

Further supporting the Court's conclusion is the Texas Consent Statute's undeniably clear statement that the federal government "shall not deprive" the rights of ingress and egress to the surface estate above Plaintiffs' subsurface minerals. The SRAs contained in the 2001 Plan, with admitted heavy-handedness, do precisely that. By effectively closing significant portions of the Park to exploring for, developing, processing, storing and transporting minerals, those portions of the Secretary's 2001 Plan that deprive mineral interest owners of their right to ingress and egress for the purposes of mineral development are "arbitrary, capricious, and an abuse of discretion, and otherwise not in accordance with the law" and the Secretary's statutory authority. 5 U.S.C. § 706(2)(a) & (c). While some federal regulation might be allowed by the terms of the cession statute, a total exclusion from access to large portions of the Park does not comport with the law.

The Court notes that while the conditions placed in the Texas Consent Statute may be binding, they are only binding to the extent that they are "not inconsistent with the governmental uses." *James*, 302 U.S. at 147. They are not effective insofar as they interfere with the effective use of the ceded area as a National Park or the Secretary's authority to promulgate regulations pursuant to the Enabling Act. The contention that this necessarily vests the Secretary with authority to pursue

any action it chooses, however, must fail.

The federal government cannot simply, by mere administrative action, subject mineral interest owners to regulations depriving them of access to their subsurface property as guaranteed by the Texas Consent Statute. Such an act, if allowed, would essentially vitiate the restrictions established by the state cession law. Defendants, moreover, have failed to establish that allowing development of mineral interests as such practice existed before the promulgation of the 2001 Plan is inconsistent with the federal government's use of the Park.

Unlike the 9B Regulations, which simply established a regulatory procedure for obtaining operating plans and proposals, the 2001 Plan actually prohibits exploration and development activities to substantial portions of the Park.  Accordingly, to the extent provisions of the 2001 Plan close certain areas of the Park to oil and gas operations or otherwise deprive Plaintiffs' rights of ingress and egress for the purpose of developing their oil and gas interests, such regulation is impermissible.

## Conclusion

Based on the foregoing, the Court hereby rules as follows:

1.     Defendants' Amended Motion for Summary Judgment (Dkt. No. 29) is **DENIED**; and

2.     Plaintiffs' Cross-Motion for Summary Judgment (Dkt. No. 26) is **GRANTED** in part and **DENIED** in part.

It is so ORDERED.

Signed this 30th day of September, 2008.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

31